FIDELITY AND DEPOSIT COMPANY OF MARYLAND, complainant-respondent,

*v.*

ALBERT E. STORR et al., defendants-appellants.

[Decided January 5th, 1934.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Bigelow, who filed the following opinion:

"Suit is brought to enjoin institution or prosecution of certain threatened or pending actions at law. Complainant is the surety on the bond of John C. Guise, Incorporated (hereafter called Guise), given to secure performance of a contract with the Rahway Valley Joint Meeting for sewer construction. One of the defendants is the receiver in insolvency of Guise. The others are creditors of Guise for materials used on the contract project.

"The Rahway Valley Joint Meeting was organized pursuant to *P. L. 1899 p. 48; Comp. Stat. p. 3588*, in order to construct the Rahway valley trunk sewer. The Guise contract covered section 1 of the sewer. Guise proceeded under his contract with such effect that on October 16th, 1930, the joint meeting took action as follows: 'Mr. Saul moved that section 1 be accepted upon the recommendation of the engineer. Seconded by Mayor Darroch. Carried.'

"By decree of chancery early in 1931, Guise was adjudged insolvent and a receiver was appointed pursuant to the Corporation act. The defendants P. W. Lambert & Company, Incorporated, Campbell Foundry Company, United States Pipe and Foundry Company, Albert E. Storr and Dale & Rankin, Incorporated, filed with the receiver claims for the materials furnished by them to Guise and used in the performance of his contract. The first two creditors claimed only as general creditors, while the latter three claimed a preference. The receiver disallowed the preference and al-

lowed all five claims as general claims. On due notice to the interested parties, the receiver's action was approved by the court August 2d, 1932.

"In December, 1931, Storr began an action against complainant on Guise's bond. As required by *P. L. 1918 p. 203,* as amended *P. L. 1920 p. 243; Cum. Supp. Comp. Stat. p. 1765,* the bond was conditioned for the payment of 'all lawful claims of subcontractors, materialmen and laborers for labor performed and materials furnished in the carrying forward, performing or completing of said contract.' By force of section 3 of the statute, no suit could be maintained on the bond by a materialman unless, within eighty days after the work specified in the contract had been accepted by the joint meeting, he had furnished to the surety a statement of the amount due him and unless he commenced his suit within one year from the date of acceptance. *Franklin Lumber Co.* v. *Globe Indemnity Co., 102 N. J. Law 9; affirmed, Ibid. 715; Warren Bros. Co.* v. *Hartford Accident and Indemnity Co., 102 N. J. Law 616; Fireproof Products Co.* v. *Dreher, 104 N. J. Law 660; Commonwealth Quarry Co.* v. *Metropolitan Casualty Insurance Co., 108 N. J. Law 518; John P. Callaghan, Inc.,* v. *Continental Casualty Co., 110 N. J. Law 390; Yale & Towne Manufacturing Co.* v. *Aetna Casualty and Surety Co., Ibid. 592.*

"Complainant, in answer to Storr's complaint, alleged that the action had not been brought within one year after the joint meeting had accepted the work. On July 28th, 1932, the joint meeting adopted a resolution that it 'hereby certifies to the completion of the work contracted to be done by John C. Guise, Incorporated, under its contract with the Rahway Valley Joint Meeting, dated May 25th, 1929, for section No. 1, and finally accepted the work.'

"Then Storr voluntarily dismissed his action and the same day brought another action against complainant as did the United States Pipe and Foundry Company. What became of these causes, I do not recall, but on November 26th, 1932, Storr and the foundry company served complainant with process in new actions on the bond. P. W. Lambert Com-

pany, Campbell Foundry Company, and Dale & Rankin furnished complainant with statements of the amount due them and thus laid the foundation for suits. On December 8th, 1932, complainant filed its bill in this cause and obtained interlocutory restraint against the prosecution of the pending actions and the institution of suits by the three defendants last mentioned.

"There is no dispute as to the amounts due by Guise to the five defendants; the only question is whether complainant is liable for the debts. It asserts that its liability expired October 16th, 1931, namely, one year after the action of the joint meeting above mentioned, taken on October 16th, 1930. The claimants deny that such action was an acceptance of the work within the meaning of the statute and allege that the work was not accepted until July 28th, 1932. I must examine more carefully the action of the joint meeting on October 16th, 1930, to determine which contention is correct.

"The sewer project consisted of a joint trunk or main stem and several branches, among which was the Woodbridge spur. Section 1, covered by the Guise contract, included the Woodbridge spur and a part of the main stem. I mention this because counsel for defendants suggests in his brief that only the work on the main stem, part of section 1, was accepted by the joint meeting on October 16th, 1930. On that occasion there was laid before the meeting three letters from the chief engineer of the joint municipalities. One dated October 10th, 1930, stated: 'Section 35, page 16, of the contract for constructing the several sections of the sewer, permits the engineer, if in his judgment it is necessary, to make a hydrostatic test upon any portion of the sewer. * * * On September 18th such a test was made on section 1 built by John C. Guise, Incorporated. The other provision of the specifications in section 35 requires that there shall be no visible leaks. An inspection of the main stems of sections 1, 2 and 3 shows that there are no visible leaks now existing in the sewer and none on the Woodbridge spur of section 1.'

"The second letter was dated October 16th. 'There still remains to be done some little clean-up work on all three sec-

tions (sections 1, 2 and 3) which is confined principally to appurtenant work other than the main sewer. It is my judgment that the main stem is now in condition to be used by the joint meeting as is stipulated in section 10, page 68, of the contract, and if it is the desire of the joint meeting to use this sewer in the near future, it is my recommendation that it is proper so to do. In order that the meeting may be informed as to the financial status of these three contracts, I am submitting the following table. This table is subject to revision when the final estimates are prepared in accordance with section DD, page 70. These estimates, however, are approximately correct as the final estimates on section 1, 2 and 3 have been substantially completed:

### SECTION 1

| | |
|---|---:|
| Amount earned | $397,287.19 |
| Amount paid | 338,127.13 |
| Retained percentage | 59,140.06 |
| Amount to be retained one year | 7,945.34 |
| Amount can be released | 51,194.72 |

From the above table the finance committee can estimate the amount of money which they will need to make a payment on account of the retained percentage as soon as the final certificates are forthcoming.'

"The third letter bears the same date. 'I have filed with the joint meeting a letter recommending that the main stem of the trunk sewer is now in a condition to use should the joint meeting so desire, and have also handed you a financial statement showing the condition of section 1, 2 and 3, with regard to the amount earned, the retained percentage, &c. Mr. John C. Guise has heretofore filed with me a request for payment on account of his retained percentage and asks for this because of the delay in removing the conduits of the Public Service Corporation. There is no doubt but that his contract would have been completed long before this, had no such delay arisen and inasmuch as I am recommending the acceptance and use of the main stem of the trunk sewer, I also recommend that the sum of $51,194.72 be paid to him on account of the retained percentage. This leaves in the

hands of the joint meeting the two per cent. for guaranty
fund as is provided in section CC, page 69, for one year after
the acceptance and use of the sewer.'

"These letters were spread upon the minutes and thereupon
the motion already referred to was passed, namely, 'Mr. Saul
moved that section No. 1 be accepted upon the recommenda-
tion of the engineer. Seconded by Mayor Darroch. Carried.'
Then the meeting unanimously carried a motion 'that John
C. Guise, Incorporated, be paid their retained percentage in
accordance with the recommendation of the engineer.' At
the end of the minutes is a note of the issuance of check No.
807 to Guise 'retained percentage section No. 1, $51,194.72.'

"On January 22d, 1931, another letter from the chief en-
gineer was received and spread on the minutes of the joint
meeting. 'Herewith please find the final estimate for John
C. Guise, Incorporated, for construction of section No. 1 of
Rahway Valley trunk sewer. This estimate is filed with the
commission for the purpose of record and the balance shown
as due John C. Guise, Incorporated, is to be retained by the
meeting in accordance with section CC, page 89, and section
DD, page 70, of the contract until October 16th, 1931, when
it will become due and payable, less any amounts which the
meeting in the meantime will be compelled to expend on
account of said contract.'

"Several of the terms employed in these letters must be
explained by the contract. Section 10, page 68, reads: 'The
joint meeting reserves the right to use any portion of the
sewer as soon as installed and tested. Such use shall not, in
itself, constitute an acceptance of the part thus used nor
relieve the contractor of the obligation to complete the work
in every respect as specified.' It is a use of this character
which the engineer, in his second letter, recommended was
then proper. Such use does not constitute acceptance.

"The contract provided for payment on a unit basis in
accordance with calculations or estimates made by the engi-
neer. Section DD, page 70, provided for monthly payments
of eighty-five per cent. of the amount due for work done. It
further provided:

" 'Two months after the time of the completion and acceptance of the work as specified and contracted for, the joint meeting will cause the engineer to make a final estimate of all work done, and the full amount of said final estimate will be paid less the two (2%) per cent. retained for repairs and any amounts retained to complete the work according to the provisions of the accompanying specifications, and less damage or money paid by the joint meeting by reason of said contractor having failed to carry out completely and faithfully all the obligations and requirements herein contained. Upon final settlement according to the conditions herein specified and not until such settlement shall have been made will the contractor be relieved from the obligation assumed in the contract.'

"The two per cent. to be retained is further explained in section CC: 'The contractor shall make all needed repairs on the work as it progresses and during a period of one year from the date of the acceptance of the final estimate, except those due to ordinary wear and tear, and he agrees that during said period of one year, the joint meeting may retain out of moneys payable to him under this agreement the sum of two per cent. on the amount of the contract.'

"Thus it appears that the parties agreed that the contractor should be paid eighty-five per cent. from month to month as the work progressed. Then two months after 'the completion and acceptance of the work' a final estimate should be made and thirteen per cent. should be paid, and one year later, the balance, two per cent. The sum $51,194.72 which, on October 16th, 1930, the engineer recommended for payment to Guise and which was paid that day, was the thirteen per cent., and was due two months after acceptance of the work. The sum of $7,945.34 which was retained was the two per cent. which would be payable one year after the 'acceptance of the final estimate.'

"It cannot be supposed that the joint meeting intended to pay and did pay the thirteen per cent. before the acceptance of the work and I construe their action, 'that section No. 1 be accepted upon the recommendation of the engineer,' as an

acceptance of the work within the meaning of that part of section DD of the contract above quoted and as an acceptance within the meaning of the statute. It may be that the meeting misunderstood the recommendation of the engineer. His language is not clear. He recommended 'the acceptance and use of the main stem,' but he also recommended payment of the sum which was due only after acceptance of the whole work, Woodbridge spur as well as main stem. But whatever the engineer meant, the intention of the joint meeting is clear. The reason for disregarding the two months' period is plain: Completion of the work had been delayed without fault of the contractor by the tardiness of a third party, the Public Service Corporation, in removing its conduits.

"Finding as I do that the joint meeting accepted the work on October 16th, 1930, it is hardly necessary to discuss the action of the joint meeting in the summer of 1932. The rights of third parties, materialmen and laborers, the liability of the surety on the contractor's bond, all began to accrue upon the acceptance of the work by the joint meeting on October 16. I doubt if these rights and liabilities could be disturbed by later action of the meeting and certainly not unless the acceptance was founded in fraud. Of this, there is no suggestion whatever. The work of building this sewer had actually been done and completed in a satisfactory manner before the acceptance. The resolution adopted by the joint meeting July 28th, 1932, again accepting the work was passed at the instigation of counsel for defendant apparently for the sole purpose of giving color to their claims that they were within time in demanding payment from complainant. Complainant is not indebted on the bond, to defendant materialmen. I must now consider what should perhaps have been considered first, whether the court of chancery has jurisdiction over the controversy.

"Complainant relies on the proposition that chancery will take jurisdiction to prevent a multiplicity of suits even though the question at issue is purely legal. The claim of each of the five principal defendants is based on the bond which complainant executed for the benefit not only of the joint meet-

ing but of 'any materialmen or laborer having a just claim.' Jurisdiction to prevent a multiplicity of suits is considered at length in *1 Pom. Eq. Jur. 243 to 275.* In the author's well-known classification, the fourth group, within which the present case falls, is thus described: 'Where the same party has or claims to have some common right against a number of persons, the establishment of which would require a separate action brought by him, against each of these persons or brought by each of them against him, and instead thereof, he might procure the whole to be determined in one suit brought by himself against all the adverse claimants as defendants.' For a statement of the scope of the jurisdiction in this class of cases, I refer to sections 269 and 274. Jurisdiction in the present case is aided by another factor already hinted at. The affairs of John C. Guise, Incorporated, are being wound up by a receiver appointed by this court. He has filed his final account and has made distribution of the fund in his hands except a sum reserved until the controversy between the surety company and the five claimants be determined. The receiver has collected from the joint meeting the balances due on the contract. If the surety company were liable to defendants on the bond it would be subrogated to the claims which they have failed with the receiver, and it would probably be entitled to preference to the extent of the money received by the receiver, the proceeds of the contract with the joint meeting; since, when it executed its bond, it took from Guise an asignment of all sums to grow due under the contract. *Guise v. John C. Guise, Inc., 112 N. J. Eq. 11.* The bill of complaint prays that the receiver be restrained from distributing the funds in his hands until it be determined whether the other defendants have lawful claims against the complainant as surety on the bond. The other creditors of Guise should not be required to submit to the delay incident to the prosecution of actions at law against complainant when the whole matter can readily be determined here in a single suit. I may add that if any proper question for a jury had arisen, I would have directed an issue to be tried in a law court. But since liability depended on the

interpretation of the minutes of the joint meeting, it is apparent that there was no need for a jury. This is a case properly for the court of chancery.

"I will advise a decree for the complainant."

*Mr. Earl A. Merrill,* for the appellants.

*Mr. Charles E. Hendrickson,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons expressed in the opinion delivered by Vice-Chancellor Bigelow in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ. 15.

*For reversal*—None.